Archer v. American Water Works Co.

CATHERINE ARCHER

*v.*

THE AMERICAN WATER WORKS COMPANY et al.

| | |
|---|---|
| 50 | 33 |
| 52 | 626 |

| | |
|---|---|
| 50 | 33 |
| 56 | 395 |
| 56 | 563 |

| | |
|---|---|
| 50 | 33 |
| 66 | 358 |
| 66 | 382 |

1. If officers of a corporation manage, through the instrumentality of their power and position, to deprive an equitable owner of stock of any of his rights, their act in its consequence is a fraud, against which equity will give relief.

2. A court of equity will compel the transfer of stock to the equitable owner thereof, upon the books of a corporation, when such transfer is fraudulently withheld by the agents of the corporation.

3. Where, by fraudulently refusing to transfer stock, the fraud-doers are put in position, through the control they thereby acquire, to seriously prejudice the interests of those who are justly entitled to the transfer, and so act as to make their purpose to accomplish that prejudice apparent, the meetings they can control will be stayed by injunction until the transfers can be compelled.

On order to show cause why injunction shall not issue. Heard on bill, answer, affidavits and exhibits.

*Mr. Lindley M. Garrison,* with whom was *Mr. David McClure,* of the New York bar, for the complainant.

*Mr. Flavel McGee,* with whom was *Mr. Elihu Root,* of the New York bar, for the defendant.

THE CHANCELLOR.

The bill, answer and exhibits present the following state of facts :

Prior to the year 1891, there existed in the State of Colorado three corporations, The Denver Water Company, The Beaver Brook Water Company, and The Mountain Water Company, which had been formed for the purpose of supplying water to the inhabitants of the city of Denver and the towns of Barnum, Highlands and Montclair, in the neighborhood of Denver.

Before the 31st of January, 1891, a new corporation was formed, under the laws of Colorado, called "The Denver City

Water Works Company," the object of which, among other things, was the consolidation of the three companies named, by the purchase of all their properties. Shortly after its organization, its purpose was accomplished, and it became the owner of the plants of the three companies.

About the same time there existed a corporation, formed under the laws of the State of Illinois, called "The American Water Works Company," which was the owner of quite an extensive water plant at the city of Omaha, in the State of Nebraska, and was engaged in supplying water to the inhabitants of that city, South Omaha and Florence.

The firm of C. H. Venner & Co., composed of Clarence H. Venner and William A. Underwood, bankers in the cities of New York and Boston, were largely interested in the capital stock of the corporation doing business at Omaha, which, for brevity, and to distinguish it from the New Jersey corporation of the same name hereinafter mentioned, I will style the Omaha Company, and, to some extent, were concerned in the bonded debt of the Denver City Water Works Company.

This firm conceived the design of consolidating the Denver and Omaha companies, and on the 31st of January, 1891, suggested a scheme to that end, which, on the 1st of March, in the same year, took definite shape in a contract between the two companies, whereby it was agreed that a new company should be formed under the laws of some state which would admit of corporate organization for the purposes proposed, of which company the capital stock should be $13,000,000, divided into one hundred and thirty thousand shares, of the par value of $100 each. Thirty thousand of those shares were to be preferred stock, and entitled to a cumulative dividend of seven per cent. each year, out of the net earnings of the company, before any dividend should be paid upon the remainder of the capital stock, which was called common stock. In case of dissolution or liquidation at any time, the preferred stockholders were to be paid $110 for each of their shares before the holders of the common stock should receive anything. The remainder of the net earnings and assets, upon liquidation, was to be divided among the holders of the common

stock. The new company was to be called "The American Water Works Company," and was to have a board of thirteen directors, six of whom were to be chosen by a majority in interest of the preferred stockholders, six by a majority in interest of the common stockholders, and the thirteenth by the twelve directors thus elected.

Of the thirty thousand shares of preferred stock, fifteen thousand and ten shares, the majority of that stock, were to go to the Denver City Water Works Company for distribution among the holders of its preferred stock, in proportion to their respective holdings thereof, and ten thousand shares were to go to the Omaha Company for the same purpose, and four thousand nine hundred and ninety shares were to remain in the treasury of the new company, to be sold or disposed of only by a vote of two-thirds of the board of directors. The one hundred thousand shares of common stock were to be divided equally between the two contracting companies. Each party to the agreement was to transfer its plant to the new corporation upon demand, subject to the mortgage encumbrances thereon. The Denver City Water Works Company was to close its accounts with its plant as of November 1st, 1890, taking all income and paying all expenses which antedated that day, and accounting to the new company for income and expenses after that day. The Omaha Company was to similarly close its account with its plant as of January 1st, 1891.

The Denver City Water Works Company plant was then incomplete. That company had made a general mortgage upon its property to secure the payment of seven thousand bonds of $1,000 each. Four thousand of these bonds had been parted with; two thousand eight hundred and sixty-two of them had been put in trust to retire maturing bonds secured by a prior mortgage; five hundred of them had been devoted to the payment of divers obligations, and six hundred and thirty-eight of them had been transferred to C. H. Venner & Co., at ninety cents on the dollar, to secure moneys that were to be furnished by Venner & Co., for the completion of the company's plant. C. H. Venner & Co. had not yet paid the moneys for these

bonds, and the company's claim upon them, it was agreed, was to pass to the new company.

Upon the same day that this agreement was entered into, C. H. Venner & Co. made an agreement with the Denver City Water Works Company, in which it was recited that Venner & Co., who would probably have six hundred and forty bonds secured by the general mortgage of that company which they would credit, at the price of ninety cents on the dollar and interest to date of delivery, to an account to be called "Denver Construction," and allow interest, at the rate of five per cent. per annum, on the credit balance of that account. The Omaha Company was to do the work of construction, until the formation of a new company, without profit to it. The work to be done was specified. It was estimated that it would cost $1,250,000. Venner & Co. were to furnish the money necessary to pay this cost and were to be reimbursed by bonds at ninety cents on the dollar and by sales of real estate, which belonged to the Denver Company and were not necessary for its corporate purposes. Six hundred and forty of the bonds were to be given to Venner & Co. at once, and other bonds, which were then held in trust by a trust company and could not be had until after July 1st, 1891, and until certain income could be derived from the company's business, were to be given to them as the necessity of the Denver construction account required. As a bonus or consideration for their undertaking, Venner & Co. were to have thirty-four thousand nine hundred and ninety of the fifty thousand shares of the common stock in the new company, which would be transferred to the Denver City Water Works Company.

On the 23d of March in the same year, the stockholders of the Denver Company reduced their capital stock, by the surrender of shares, to fifteen thousand and ten shares, so that they would have a share of the common and a share of the preferred stock of the new company for each share of their Denver Company stock. They were to have, it is remembered, fifteen thousand and ten shares of the preferred stock in the new company, and fifty thousand shares of the common stock in that company, less the thirty-four thousand nine hundred and ninety shares of

common stock which they had agreed to transfer to Venner & Co., which would be fifteen thousand and ten shares of common stock.

On the 31st of March, 1891, the contemplated new company was formed under the General Corporation law of New Jersey, in accordance with the agreement between the Denver and Omaha companies. The certificate of its incorporation provided that the capital stock should consist of one hundred and thirty thousand shares of the par value of $100 each, of which thirty thousand shares should be preferred, and that there should be thirteen directors, six of whom should be elected by the preferred stockholders from their own number, and six of whom should be elected by the common stockholders from their number, the thirteenth to be chosen by the twelve thus selected, thereby limiting the powers of the stockholders in the selection of directors, under authority given by subdivision 5 of section 11 of the Corporation act. *Rev. p. 180.*

The corporators subscribed for one hundred shares of stock, and C. H. Venner & Co. paid the subscription, taking from the corporators assignments of the shares which were placed in their names upon the books of the company without noting the assignment in the transfer books.

On the 28th of April, 1891, the properties and plants of the Denver City Water Works Company and the Omaha Company were transferred and conveyed to the new corporation, and, to pay for them, it was resolved by the board of directors of the new company that twenty-five thousand and ten shares of preferred stock and the entire common stock be issued and divided; fifteen thousand and ten shares of preferred stock and fifty thousand shares of common stock to the Denver Water Works Company, and ten thousand shares of preferred stock and fifty thousand shares of common stock to the Omaha Company. C. H. Venner & Co. were made the transfer agents of the company, and the Farmers' Loan and Trust Company, of New York, was made the registrar of the transfers. The banking office of Venner & Co., in New York city, was made the office of the company.

On the same day certificates for the stock, thus ordered to be issued, were prepared by Clarence H. Venner, as vice-president of the new company, in conjunction with George Deas, who had been elected treasurer of that company. To the Omaha Company certificates for ten thousand shares of preferred stock and fifty thousand shares of common stock were issued, and four stock certificates were made out in the name of the Denver City Water Works Company; one for fifteen thousand and ten shares of preferred stock and three for fifty thousand shares of common stock, they being respectively for fifteen thousand and ten, nine thousand nine hundred and ninety, and twenty-five thousand shares of that stock. Of these four last-mentioned certificates, those for nine thousand nine hundred and ninety shares and twenty-five thousand shares respectively, were delivered, but the two certificates for fifteen thousand and ten shares each were retained in the custody of Mr. Venner. Of the two certificates actually delivered to the Denver Company, the one for twenty-five thousand shares was assigned to C. H. Venner & Co., and surrendered, so that the stock was transferred to that firm on the stock books. The certificate for nine thousand nine hundred and ninety shares yet remains in the custody of the Denver City Water Works Company.

The reason for Mr. Venner's retention of the two certificates for fifteen thousand and ten shares each is disputed.

Upon the part of the complainant it is insisted that C. H. Venner & Co. desired to list the stock and bonds of the new company on the New York Stock Exchange, so as to give them a market value, and, in order that the stock and bonds might be favorably received upon the market, desired to control the quantities offered for sale. They were largely interested in the issue to the Omaha Company, and were able to control other stockholders in that company, but feared that the stockholders of the Denver Company, who were beyond their control, might hasten to sell their holdings if the stock of the new company was distributed to them, hence they held back the two Denver certificates, intended for distribution among the stockholders of that company, under a tacit, but unauthorized, understanding with a

committee which represented those stockholders, that they might do so for ninety days.   After the expiration of the ninety days, difficulties arose in the management of the company which made it advantageous to Mr. Venner personally to control the election of a majority of the directors of the new company, and, in order to prevent a distribution of the Denver stock among the stockholders to whom it belonged, and thus bar out those stockholders from participation in the election of directors, he arbitrarily held the certificates of stock to which they were entitled and refused either to deliver them up or to issue new certificates to the several stockowners in their stead.

It is claimed that his scheme was to elect six directors who would be in sympathy with him, with the common stock, a majority of which he held, and, by withholding the fifteen thousand and ten shares of preferred stock due to the Denver Company, as undelivered ; also to elect six more directors in his interest by the ten thousand shares of preferred stock which had gone out, of which he controlled the majority, and, at all events, to hinder the individual stockholders of the Denver Company from qualifying themselves, by becoming the owners of stock on the books of the new company, to actively take part in the affairs of the corporation by advising and voting at stockholders' meetings.

Upon the part of Mr. Venner, it is claimed that he withheld the certificates in his capacity as vice-president of the new company, because the Denver Company had failed to account for its receipts and disbursements after November 1st, 1890, as it had agreed to do, and because a person who had an equitable interest in some stock of "The Denver Water Company," one of the three companies consolidated into the Denver City Water Works Company, was protesting that the Denver Water Company did not possess power to convey its property to the Denver City Water Works Company against his objection.   He states that he withheld the certificates until he could lay the causes for withholding them before the directors of the new company.

In reply to this position, it is insisted that the causes alleged for withholding the certificates are seized upon as a pretext to

cover the perpetration of a fraud upon the rights of the Denver stock owners, and that they are·after thoughts, taking life in defensive ingenuity since the commencement of this litigation.

The answer of Mr. Venner admits the alleged desire of Venner & Co. to list the stock of the company on the New York Stock Exchange, and the arrangement by which the certificates in question were not to be withdrawn for ninety days, and denies that those certificates were ever delivered to the Denver City Water Works Company. It admits that the certificates were drawn and duly executed, in accordance with the resolution of the directors of the new company. When it was arranged that the certificates should remain in the hands of Venner & Co., it does not appear that Mr. Venner suggested either cause for their retention which he now insists upon, or, indeed, any other reason therefor than to aid in listing and marketing the stock. The correspondence with the dissenting stockowner of "The Denver Water Company" exhibits that before the purchase of the Denver City Water Works Company's plant by the new company, that stockowner's attitude was distinctly defined and well known, and that four days prior to that purchase Mr. Venner, under his own hand, wrote regretting that stockowner's "belligerent frame of mind." Yet it was in face of this situation, and without reference to it, that the Denver plant was purchased and taken possession of, the certificates of stock made out to the Denver Company, and the arrangement entered into to hold the certificates because of the listing. Although several meetings of directors were held after the issue of the certificates, Mr. Venner made no suggestion, either to the directors or to the president of the company, that he withheld them for the causes now urged. And it is a noteworthy fact, in testing the sincerity of Mr. Venner's present attitude, that he did not hesitate to deliver the two certificates for nine thousand nine hundred and ninety shares and twenty-five thousand shares, which were to come to him, and would not equip the stockholders of the Denver Company to do him effective battle. And it is also significant that two stockholders of the Omaha Company refused their assent to the transfer of the property and plant of that company

Archer v. American Water Works Co.

to the new corporation, and that instead of withholding the certificates for ten thousand shares of preferred stock and fifty thousand shares of common stock from the Omaha Company, Mr. Venner, taking himself, or for his firm, a controlling interest in that stock, delivered them so that the stock was distributed, and he and his firm obtained their controlling interest in it.  In this instance he adopted the plan of causing a proper distributive portion of the stock to be tendered to the dissenting stockholders of the Omaha Company ; and, upon their refusal to accept it, to be transferred to the treasury of the Omaha Company, there to be held as the only security against the event of their objections.  The cause for retention at the outstart is most unequivocally shown in a telegram which Mr. Venner sent to Mr. Underwood, at Denver, on the 27th of April, 1891, in which, among other things, he said :  " It is very necessary to have Denver parties tied up on stock, so that we can control the market on both for ninety days after listing—will you manage it ? " and by Mr. Underwood's reply :  " Keep the Denver Water Company's new stock until May 15th, then will arrange to keep it in Denver Water Company's name for ninety days after listing—this is Sullivan's suggestion."

The history of the difficulties which occurred within the ninety days after the 15th of May, thus referred to, exhibits the subsequent necessities of Mr. Venner and throws light upon his motives and intentions.

The by-laws of the new corporation permitted the directors to fill vacancies in their membership pending the next annual election by the stockholders.  The first board of directors, chosen by the corporators, were friends and clerks of C. H. Venner & Co., and they were nominally qualified as such directors by transfers to them respectively of shares of the stock subscribed for by the corporators and paid for by Venner & Co.  As it became advantageous or necessary to replace this board with other men, members of it resigned and those others were elected in their stead, and the incoming members were nominally qualified by the transfer to them of stock purchased and owned by Venner & Co.

Thus, by the 9th of June, 1891, the board of directors became composed of six directors representing the interest of the Omaha Company, and six directors representing the interest of the Denver Company. Mr. Underwood, Venner's partner, was chosen as the thirteenth director and was made president of the new company. There were two vice-presidents, Dennis Sullivan, of the Denver interest, and Mr. Venner. The secretary was Francis P. McManus, in the Denver interest. The assistant secretary was George P. Toby, a clerk of Venner & Co., and the treasurer was George Deas, also with Venner & Co.

In July, 1891, a rupture occurred in the management of the company. What its cause was does not distinctly appear, but I gather from the resolutions adopted at a meeting of the finance committee of the directors, held on the 19th of June, that it was due partially to the inability of Venner & Co. to negotiate the bonds of the company and raise the moneys their contract required them to furnish. The drafts from Denver were said to be in excess of the contract requirements, but it is quite clear that they were more than $180,000 within the amount for which Venner & Co. had bonds at ninety cents on the dollar. Besides these drafts there were expenditures at Omaha for which Venner & Co. furnished the money, upon an open account with the company or for its notes. They were not bound to supply money for the last indicated expenditures, but their large holding of the stock and bonds made it necessary in their self-preservation. Mr. Venner fretted under the situation, and complained that his firm was compelled to alone carry a burden which his complaint signified was a dangerous one to them.

On the 27th of July, 1891, at a meeting of the directors, Mr. Underwood resigned his directorship and the presidency of the company, and his resignation was accepted, upon Mr. Venner's motion. Evidently there was a breach between Underwood and Venner. Three days later the firm of C. H. Venner & Co. was dissolved by the retirement of Mr. Underwood from it, and Mr. Venner retained its assets and assumed its liabilities. Immediately a new firm was formed, composed of Messrs. Venner and Toby and one Mills, who had been the Boston manager of the

old firm, under the same firm name.  On the 3d of August the Denver City Water Works Company resolved to distribute the stock represented by its two certificates of fifteen thousand and ten shares each among those to whom it rightly belonged, and, in its resolution, specified the persons to whom it should go and the manner of shares each person was to have, and directed that, in the distribution, the complainant, Catherine Archer, should have four thousand four hundred and eighty-two shares of each the common and preferred stock.  Notice of this distribution was given to C. H. Venner & Co., and demand was made of them and of Mr. Venner to surrender the certificates withheld, that they might be properly endorsed for transfer according to the resolution of distribution.  This demand was not complied with, and no reply, of any nature, was made to it. The causes now alleged for their retention were not, even then, suggested.  The last meeting of directors of the new company, at which there was a quorum, was held at the office of Venner & Co. in New York, on the 23d of September.  At this, meeting, Mr. Venner gave notice that Venner & Co. demanded payment of $110,000 due to them on account of advances for the Omaha plant.  This meeting was adjourned to the 3d of October.  In the meanwhile, on the 28th of September, Messrs. Sullivan and McManus brought suit in the supreme court of the State of New York to recover from Venner & Co. $204,000, which they claimed was due from Venner & Co. to the new company for bonds which had been delivered to them on account of the Denver construction, charging them with insolvency, and asking that the $110,000, claimed by the firm, be offset against the $204,000 that the firm owed to the company, and that the new company have judgment for the difference between those sums, and praying an injunction which would restrain Venner & Co. from parting with the notes of the company held by them, and from assigning the stock which the Denver Company had transferred to them.  On the 30th of September, Venner & Co. suspended payment of their obligations.

The meeting of directors, which had been adjourned to Octo-

ber 3d, was not held because Mr. Venner, and the directors he controlled, refused to attend and make a quorum.

On the 5th of October, Mr. Sullivan, as vice-president, and Mr. McManus, as secretary, and Mr. Deas, as treasurer, in behalf of the Denver faction, opened an office for the company in Jersey City in this state, and opened also a new set of transfer books, and, some time later, issued their certificates of stock in the new company, in accordance with the resolution of the Denver Company, giving to the complainant certificates for four thousand four hundred and eighty-two shares of each kind of stock, common and preferred.

Strife between the factions continued, and, it is claimed, moneys were collected at the different plants and misappropriated.

On January 11th, 1892, suit was instituted in the United States circuit court for the district of Nebraska, which resulted, in the February following, in the appointment of a receiver for the Omaha plant, and later, another suit, at Denver, resulted in the appointment of another receiver for the plant there. In the meanwhile, Mr. Venner, as vice-president, and Mr. Toby, as assistant secretary, opened another office for the company in Jersey City, to which they removed the original transfer books from New York city.

The by-laws of the new company prescribe that the annual meetings of the stockholders shall be held at Jersey City, on the 6th day of April in each year, upon four weeks notice by publication.

On the 1st of March the faction led by Vice-President Sullivan published a notice for the annual meeting at the office they had established for the company at No. 1 Montgomery street, in Jersey City, to be held on the 6th of April, 1892, at noon, and on the 8th of March the faction headed by Vice-President Venner published a notice of the meeting for the office they had established for the company at No. 1 Exchange place, Jersey City, directly across Hudson street, from No. 1 Montgomery street, at eleven o'clock in the morning of the same day.

In the meantime, while these rival notices appeared, the legislature of New Jersey passed a supplement to the Corporation act, which was approved by the governor on the 10th of March, 1892, which provides that whenever, by reason of the failure of a sufficient number of the board of directors of any corporation to attend three successive meetings of such board, regular or special, duly called, a quorum is prevented, the stockholders of the company shall thereupon, and until a legal meeting of a quorum of the board of directors shall be held, have power to act in the place of the directors, and that for that purpose special meetings of the stockholders of the company may be called by any officer, or by three stockholders, upon three days' notice by mail to each stockholder.

Quickly after the approval of this act, Messrs. Venner and Toby, on the several days, March 15th, 16th and 17th, issued notices for three several meetings of directors, to be held respectively upon the 24th, 25th and 26th days of the same month, and on the very day of the approval of the law, by notice reciting a case within its provisions, they called a stockholders' meeting for the 30th of March, at ten o'clock in the morning, at No. 1 Exchange place, sending written notices thereof to stockholders in Denver, Omaha and even in Europe.

The stock books in the hands of the Venner faction are the only books which were authorized by a lawful board of directors, and I can see no escape from an acceptance of them as the lawful stock books of the company. They show the following condition of the stock—of the common stock thirty-three thousand seven hundred and sixty shares are disentitled to vote, eighteen thousand seven hundred and fifty of which Omaha stockholders refuse to accept, and fifteen thousand and ten of which are due but undelivered to the Denver stockholders. Taking these reserved shares from the entire one hundred thousand shares of the common stock of the company, sixty-six thousand two hundred and forty shares remain to be voted at the stockholders' meetings, and of this number of shares Mr. Venner and his firm hold forty-one thousand one hundred and eighty-seven, the majority. The books also show that out of the thirty thousand shares of pre-

ferred stock of the company, twenty-one thousand seven hundred and fifty shares is really not voting stock, eighteen hundred and fifty of it Omaha stockholders refused to accept, four thousand eight hundred and ninety of it are held as treasury stock, and fifteen thousand and ten of it are due but undelivered to the Denver stockholders. Substracting these withheld shares from the whole number of shares of preferred stock, nine thousand two hundred and fifty shares are left with voting power, and of those shares Mr. Venner and his firm hold four thousand eight hundred and ninety, the majority. I should here again state that the stock which the Omaha stockholders have refused to accept has been transferred to the Omaha Company, and say that that company is controlled by Mr. Venner, and if it votes upon that stock it will naturally vote as Mr. Venner directs. Thus, it appears that if the Denver stockholders are not permitted to vote upon their stock, Mr. Venner will be able not only to elect the entire board of directors, but also to manage stockholders' meetings, whether those meetings are acting for the directors or otherwise, as he pleases.

In this situation the complainant insists that Mr. Venner withholds her stock and the stock of the other Denver stockholders, not in good faith for the causes he asserts for the first time in this suit, but for the purpose of depriving them of the right to vote at stockholders' meetings, and of qualification to take part in the deliberations at those meetings, to the end that he may control the company, by naming all the directors thereof, and determining all questions presented at stockholders' meetings, according to his arbitrary will, and she prays that this court will, by its decree, determine who the stockholders of the American Water Works Company are, and the number of shares to which each is entitled; that stock certificates issued in New York city are not legal, and are not evidence of title to the stock; that such certificates shall be delivered up and cancelled; that new certificates shall be issued according to the rights of the stock; that the stock books held by the Denver faction are not the lawful stock books; that the stock books of the Sullivan faction are the lawful stock books; that a stock-

·holders' meeting shall be held after the stock is adjusted; that ·the holding of all meetings now called be restrained, and that she may have such other and further relief as may be equitable.

The American Water Works Company and all its stockholders, as they appear upon both sets of stock books, together with the Denver City Water Works Company, are made defendants ·in the suit.

Upon the presentation of this bill, the order to show cause now under consideration was granted, and with it the holding of the rival stockholders' meetings, which were advertised for the 30th of March and the 6th of April, were restrained, leave being given to adjourn them from time to time and thereby keep them alive. The hearing was had on the 27th and 28th of May last.

It is objected to the suit, in behalf of the defendant Venner, who answers for himself and also, unwarrantedly, for the Ameri-·can Water Works Company, that this court is without jurisdiction in the premises, there being an adequate remedy at law ·under the forty-fourth section of the Corporation act (*Rev. p. 184*), which provides that any one aggrieved by an election of the stockholders of a corporation may apply to the supreme ·court, and that thereupon that court may, in a summary manner, inquire into the matter or causes of complaint, and thereupon ·establish the election complained of, or order a new election, or make such order, and give such relief in the premises, as right .and justice may appear to it to require.

The precise limit of the jurisdiction conferred by the section referred to has not been judicially defined, but it appears to me to be plainly apparent that many of the questions submitted by the prayers of the bill may be settled in its exercise. As incident to the review of an election, the stockholders who can vote and the number of their shares must be determined, and so also the legality of transfers of stock without the state, and as well the legality of the stock books, and the question whether there was a delivery of stock, may be passed upon; and I presume that these prayers have induced the objection now interposed to the jurisdiction of this court, but I do not conceive that it will be .asserted or held that the statute referred to confers jurisdiction

upon the supreme court to compel the transfer of stock to an equitable owner from whom it is fraudulently withheld, before the fraud-doers can act in such a way as to irreparably prejudice his interest. I understand that relief in such a case is the real object of this suit.

The bill is loosely drawn and so full of redundant matter as to make the purpose of the draughtsman and his conception of the principles which are to govern this case obscure and very difficult of comprehension. Some of the special prayers of the bill approach the proper relief, but fall short of stating it clearly. I understand that the bill was not drawn by counsel who represented the complainant at the argument. I think, however, that the relief which this court may give is agreeable to the case made by the bill. It is met by the answer and was discussed at the argument, and, without surprise to the defendants, may be afforded under the prayer for general relief, if it may not be given under the special prayers. It is to be directed against fraud, and to compel a transfer of legal title to.an equitable owner, and it is clearly within the ancient, well-defined and undoubted jurisdiction of this court, the jurisdiction which, under our constitution, the legislative power of this state cannot disturb. In such a case the mere existence of a concurrent, adequate remedy at law will not oust this court of its jurisdiction. In matters of trust and fraud it has jurisdiction, whatever may be the jurisdiction at law.

The case presented is one in which the enforcement of a trust is asked. It is a case in which protection of an equitable right, growing out of the contract for the consolidation of the Denver and Omaha Companies into a new company, whereby stock of the new company was agreed to be transferred to the contracting companies for distribution among their respective stockholders, is sought. The stockholders of the Denver Company are the *cestuis que trustent,* behind their immediate trustee, the Denver Water Works Company. That trustee is not only willing, but anxious, to execute its trust, but it is hindered by the fraudulent conduct of the agents of the new company. The new company in turn has had the consideration for its stock, and, therefore,

holds the stock in trust for those in whose behalf that considera-
tion was given. ·The duty of this court is to remove the fraudu-
lent barrier to the delivery of the stock to the immediate trustee,
and to compel transfers to the *cestuis que trustent,* which the con-
ditions of the trust require and the immediate trustee demands.

It is said in *Morawetz on Corporations* § *219 :*

"If shares are held by a corporation or an individual upon an expressed or
implied trust for another, a court of equity will always furnish a remedy to
the *cestuis que trust* against the trustee to protect his equitable right and obtain
a transfer of the legal title. Under these circumstances, the jurisdiction in
equity does not depend upon special circumstances, as where specific perform-
ance of the legal obligation is sought, but upon the ground that the plaintiffs'
rights are cognizable in equity."

Illustrative of the jurisdiction thus asserted is the case of
*The Mechanics' Bank of Alexandria* v. *Seton, 1 Pet. 299,*
where one Lynn bought bank shares as trustee for Wise. The
trust was not set out either on the stock certificate or in the
transfer books of the bank, but it was known to the bank.
Lynn attempted to transfer to those who claimed under Wise—
Wise being dead—and was met by a claim upon the stock in
virtue of the bank's charter, for Lynn's debt to the bank. The
*cestuis que trust* sought to compel the transfer in equity, and
were confronted by objection that the suit should be at law. Mr.
Justice Thompson, in delivering the opinion of the court, after
stating that the suit was not one for special performance, con-
tinued in this language : "The bill does not set up any con-
tract between the complainants and the bank, nor does it seek a
specific performance of any express contract whatever, entered
into with the bank ; it only asks that the bank may be com-
pelled to open its transfer books and permit Adam Lynn to
transfer the stock. By the charter, and by the laws of the bank,
such transfer would only be made upon the books of the bank, and
it was by their consent alone that this could be done.

"Although it might be the duty of the bank to permit such
transfer, it would be difficult to sustain an action at law for re-
fusing to open its books and permit the transfer. Nor have the
appellants shown such a claim to the stock as to authorize the

court to turn the appellees round to their remedy at law against Lynn, admitting they might have it; at all events, the remedy at law is not clear and perfect; and it is not a case for compensation in damages, but for specific performance, which can only be enforced in chancery."

Possibly, when there is a clear legal obligation to transfer stock, the transfer may be compelled by *mandamus*, *State, ex rel. Brush*, v. *Warren Foundry and Machine Co.*, *3 Vr. 439*, but the weight of authority, at least where the relator is an equitable assignee, is the other way. *1 Morawetz Corp. 215 § 16; Cook Stock. § 390*, where the cases are collected. The adequate remedy is in equity.

But passing from the ground upon which relief in this court is to be had, as well established by precedent and in principle, we come to the question whether an injunction should issue to restrain the stockholders of the American Water Works Company from meeting until the complainant shall secure her rights.

Ordinarily courts of equity will not interfere with the management of the affairs of a corporation, but when through fraud a serious wrong is threatened, for which there can be no adequate redress at law, special reason for equitable interference is presented, which demands the protection that a court of equity is able to afford.

Such a case appears to me to be now before me. The complainant has an important interest in the American Water Works Company. Taking her shares at par, her investment represents $896,400, or about one-fourteenth of the entire ownership of the company. By the arbitrary will of one man she is to be deprived of the right to represent this large ownership by voting at stockholders' meetings and by taking part in the counsels of the stockholders, the exercise of which rights the law recognizes as of the utmost importance, not only to the individual stockholder, but also to the public at large. *Cone* v. *Russell*, *3 Dick. Ch. Rep. 208*. And the corporation in which she is so heavily interested is to go into the control of the very man who seeks to exercise the power he has seized. He is a man who has been obliged to suspend payment to his creditors

Archer v. American Water Works Co.

because of his financial inability, or, in plain words, a man who is known to the law as an insolvent. Besides, he claims that the corporation is largely indebted to him, when the appearances strongly point to the reverse of that fact. It can hardly be for a moment doubted that his proposed control is to secure his doubtful claim. The injunction obtained in New York by Messrs. McManus and Sullivan has been dissolved, because, among other reasons, they are without authority to maintain the suit in the name of the company. It is evident that such control would be exceedingly dangerous to the rights of the complainant, and, within probability, productive of irreparable injury to her.

I am satisfied that the reason given for withholding the complainant's stock is mere pretext. The facts I have stated, and the conditions surrounding the parties, point so strongly to this conclusion that I need resort to no further argument to exhibit its justness.

Suppose the Denver Company has not accounted, and it is in proof that it has never been asked to do so and has never refused to do so, from whence does a right come to withhold its stock? No source from which such right can come has been suggested upon the argument, and none appears to me as the result of my considerations. Suppose, through objections by a dissenting stockholder, the validity of the title to the Denver property is threatened, can the purchase price be withheld? No action is pending to question it, and there has been no eviction from any part of it. The source of the right claimed here is not suggested or perceived. I have failed to find that a legal right to withhold the stock exists, even if the causes claimed therefor can be substantiated and are not invoked at this time merely as the pretext for a fraudulent act. If they should, however, prove to be substantial dangers, it may become my duty in administering equity to afford protection against them as a condition to the relief I am asked to give.

The bare statement of the facts in this cause, without argument, makes it plain that the scheme of Mr. Venner and his party is, that Mr. Venner shall control the company by depriv-

ing others of their rights.    The execution of such a scheme is a fraud.    *Elkins* v. *Camden and Atlantic R. R. Co., 9 Stew. Eq. 467; Hilles* v. *Parish, 1 McCart. 380.*

I think it is plainly my duty to interfere by injunction, to prevent the perpetration of the wrong here threatened.    If the present directors of the company, and they are all parties to this suit, continue their dissensions, so that the affairs of the company are not speedily attended to, upon a proper application I will care for the property, pending determination of the suit, through the instrumentality of a receiver.    Such action will be supported by precedents and authority.    *Featherstone* v. *Cook, L. R. (16 Eq.) 268; Trades Auxiliary Co.* v. *Vickers, L. R. (16 Eq.) 303; Einstein* v. *Rosenfeld, 11 Stew. Eq. 309.*    My interference, however, by injunction and receiver will be limited to the imperative requirements of the present emergency.

An injunction may issue to restrain the holding of any meeting of stockholders until further order herein.